NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0357n.06

No. 24-2115

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 13, 2026
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| AFZAL BEEMATH, | ) | |
|       Petitioner-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| UNITED STATES OF AMERICA, | ) | DISTRICT OF MICHIGAN |
|       Respondent-Appellee. | ) | |
| | ) | OPINION |
| | ) | |
| | ) | |

Before: MOORE, CLAY, and NALBANDIAN, Circuit Judges.

**CLAY, Circuit Judge.** Petitioner Afzal Beemath appeals from the district court's judgment denying his 28 U.S.C. § 2255 motion to vacate his sentence. In 2021, Beemath pleaded guilty to conspiracy and unlawful distribution of controlled substances under 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). The district court sentenced him to a term of imprisonment of 120 months. Beemath moved to vacate that sentence, primarily claiming ineffective assistance of counsel. For the reasons set forth below, we **AFFIRM** the district court's judgment denying Beemath's motion.

## I. BACKGROUND

### A. Factual Background

Petitioner Afzal Beemath was a medical doctor who attended medical school in the Dominican Republic and then began a residency program at St. Joseph Mercy Oakland in Pontiac, Michigan. In 2008, Beemath's residency program investigated him and found irregularities in his

prescriptions of OxyContin and other medications, so the program terminated his enrollment. State regulators filed an administrative complaint against Beemath related to that investigation, and the parties entered a consent order to resolve it. As part of that consent order, Beemath was required to participate in continuing education about prescribing medications and medical ethics. Beemath ultimately completed a residency program at Wayne State University and a postgraduate fellowship in palliative medicine. By 2010, Beemath had his full license to practice medicine in Michigan and a license to prescribe controlled substances. He has served in several roles as a physician and, most relevant to this case, he opened his own palliative care clinic in 2013 in Lathrup Village, Michigan.

At his clinic, Beemath prescribed controlled substances, namely oxycodone, oxymorphone, and Xanax, to patients who did not have legitimate medical needs. Based on the government's evidence, Beemath would see dozens of patients in a day, many of whom would pay in cash, and he would prescribe them opioids and other potentially lethal medications without proper examination. He would make efforts to appear as though he was complying with state law, such as by prescribing other innocuous maintenance drugs, checking the Michigan Automated Prescription System, and sporadically screening patients' urine. He would even reprimand patients who failed their urine analyses and coach them on how to prepare and avoid flags in future results. Specifically, he would instruct them that their urine had to show that they were taking the drugs he had prescribed and no other illicit drugs.

Beemath worked with recruiters who would secure appointments for and receive payment from new patients. He would charge them cash for visits only if the patient was leaving his office with a prescription. Many of the patients who received opioid prescriptions from Beemath would sell those pills to others, and Beemath made comments revealing that he was aware of that fact.

By August 2018, state regulators brought a superseding administrative complaint against Beemath for his prescribing practices. A disciplinary subcommittee of Michigan's Board of Medicine alleged that in 2015 and 2016 Beemath was among the top prescribers of commonly abused and diverted controlled substances in the state, that a large proportion of Beemath's controlled substance prescriptions were for Xanax, oxycodone, oxymorphone, and a few others, that a disproportionate number of patients receiving those prescriptions from Beemath were paying in cash, and that Beemath consistently prescribed controlled substances to patients with discrepant urine drug screen results.

### B. Procedural Background

In October 2018, a federal grand jury indicted Beemath on 1 count of conspiracy to possess with intent to distribute and to distribute controlled substances under 21 U.S.C. §§ 841(a)(1) and 846, and 14 counts of unlawful distribution of controlled substances (aiding and abetting) under 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1). The indictment charged him with writing prescriptions for controlled substances outside of the scope of professional medical practice, in exchange for cash payments, and working with coconspirators who recruited patients to Beemath's clinic. Those controlled substances included oxycodone, oxymorphone, and alprazolam, known by the brand name Xanax. Later, a superseding indictment added 16 additional counts of unlawful distribution of controlled substances (aiding and abetting) under 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1).

The district court continued the trial multiple times at Beemath's request, because Beemath required additional time and resources to prepare for trial while in custody. Throughout the protracted lead up to trial, Beemath indicated that he was uninterested in a plea agreement.

The parties reviewed discovery, prepared expert reports, and filed proposed voir dire questions and trial exhibit objections.

Among the pretrial motions was the government's motion to admit *res gestae* evidence. The government anticipated that Beemath would raise a mental state defense. It argued that because the government would have to prove mens rea beyond a reasonable doubt, the evidence in question would serve the proper purposes of either completing the story of the charged conspiracy or establishing Beemath's intent and knowledge under Federal Rule of Evidence 404(b). Specifically, the government sought to introduce evidence related to Beemath's past unlawful prescribing, the relationship between Beemath and his coconspirator, and the state's previous disciplinary actions against Beemath. Beemath was present when the government raised this issue before the district court.

Also in anticipation of the mens rea issue, the parties stipulated to the exclusion of improper expert testimony regarding Beemath's criminal intent. Their stipulation acknowledged, "Conspiracy to possess with the intent to distribute and to distribute controlled substances, and unlawful distribution of controlled substances both have a 'knowing and intentional' element . . . ." Stipulation Exclude Improper Test., R. 110, PageID #732 (citation omitted).

The week before trial, after "everyone had worked up the case, the government had prepped its witnesses, and was basically spring-loaded and ready to go[,]" Beemath changed his plea to guilty without a written plea agreement. Sent'g Hr'g Tr., R. 188, PageID #1618. Beemath would plead guilty to 20 of 31 counts, and the government would dismiss the rest. In a hearing before the district court, Beemath confirmed that he had conferred with counsel, he believed the oral plea agreement was in his best interest, he had a copy of the indictment, his attorneys had explained the elements that the government would have to prove to convict him, he had a chance to consider the

advantages and disadvantages of going to trial, he had a chance to discuss his options and the plea agreement with his attorneys to his satisfaction, and he was pleading freely and voluntarily because he was in fact guilty. The district court explained that at trial the government would have to prove "that [Beemath] knowingly caused or aided and abetted others in distributing [controlled substances] . . . outside of the scope of [] professional practice and for no legitimate medical purpose." Plea Hr'g Tr., R. 134, PageID #857. Beemath confirmed that he understood the elements of the charges against him and that he believed the government could prove them beyond a reasonable doubt. He stated, "I plead guilty to having an agreement with [others] to prescribe controlled substance for illegitimate medical purposes." *Id.* at PageID #858. He admitted that he had two individuals recruit patients who did not have legitimate medical need for the controlled substances that he prescribed for them and that he believed at the time that those prescriptions had no legitimate medical purpose.

For consideration at sentencing, the government submitted a report by the expert it had retained for trial. In that sealed report, a board-certified internal medicine and addiction medicine physician analyzed Beemath's patient records. He opined that Beemath had prescribed controlled substances outside of professional norms and not in good faith.

In his allocution, Beemath referred to his actions as "willful blindness toward illegal activities contributing to the opioid epidemic" and stated that he "should have done more to ensure stricter adherence of patients in the use of controlled substances while under [his] care." Sent'g Hr'g Tr., R. 188, PageID #1642. He suggested that his medical schooling had not trained him to properly manage opioid treatment. The district court responded that Beemath had previously been subject to questioning about his prescribing practices and called before a disciplinary body and that he had "depart[ed from] sound medical practice for the purpose of making money . . . ." *Id.*

at PageID #1649–50. After the district court announced the sentence, neither party had any additional objections or questions.

The district court entered judgment sentencing Beemath to a below-guidelines sentence of 120 months per count, to run concurrently, three years of supervised release, a $2,000 assessment, and a $20,000 fine. Beemath appealed, and this Court affirmed the judgment. *United States v. Beemath*, No. 21-2750, 2022 WL 2279852, at *1 (6th Cir. June 23, 2022).

Beemath next filed a 28 U.S.C. § 2255 motion in the district court, making several arguments that the court should vacate his sentence. One of those arguments was that U.S. Supreme Court cases decided after his sentencing showed that Beemath had received ineffective assistance of counsel and that the record did not support his guilty plea. Specifically, the government had to prove beyond a reasonable doubt that Beemath knowingly or intentionally acted in an unauthorized manner, and counsel had allegedly misadvised him about the mens rea element and a potential good faith defense. The government opposed the motion and provided a sealed affidavit by Beemath's trial counsel. The affidavit asserted that Beemath's attorneys had performed effectively and that Beemath pleaded guilty because he knew that he was guilty and counsel believed that strategy would be in Beemath's best interest.

The district court denied Beemath's motion without a hearing. *Beemath v. United States*, No. CR 18-20713, 2024 WL 4828717, at *1 (E.D. Mich. Nov. 19, 2024). Still, the court acknowledged that "if Beemath's attorneys told him that good faith was no defense to the charged crimes, they performed deficiently by misinforming him of the governing law." *Id.* at *14. Notwithstanding that deficiency, Beemath would not be able to make the necessary showing that opting for trial "would have been rational under the circumstances." *Id.* at *15 (quoting *Pilla v. United States*, 668 F.3d 368, 373 (6th Cir. 2012)). The district court granted a certificate of

appealability only as to "the question of whether the petitioner's counsel was ineffective by allegedly failing to advise him of the availability of a good faith defense to his charges under 21 U.S.C. § 841(a)." Order, R. 210, PageID #1869. Beemath appeals the district court's denial of his § 2255 motion within the scope of that certificate of appealability.

## II. DISCUSSION

On appeal, Beemath argues that the district court should have held an evidentiary hearing before denying his motion to vacate his sentence. He asserts that such a hearing was necessary to decide facts related to his ineffective assistance of counsel claim. Because the record is not dispositive, he says, further development was needed to establish what advice his attorneys had given him about a potential good faith defense, and how that advice would have affected Beemath's decision to plead guilty.

"We review a district court's denial of a § 2255 motion de novo and its factual findings for clear error. Ineffective assistance of counsel claims, which are mixed questions of law and fact, are reviewed de novo." *Gilbert v. United States*, 64 F.4th 763, 770 (6th Cir. 2023) (first citing *Bullard v. United States*, 937 F.3d 654, 658 (6th Cir. 2019); and then citing *Rodriguez-Penton v. United States*, 905 F.3d 481, 486 (6th Cir. 2018)). The "refusal to conduct an evidentiary hearing with respect to a . . . § 2255 motion[,]" though, this Court reviews "for abuse of discretion . . . ." *Campbell v. United States*, 686 F.3d 353, 357 (6th Cir. 2012). We "require[ a hearing] unless the record conclusively shows that the petitioner is entitled to no relief." *Id.* (quoting *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999)). "A court abuses its discretion when it relies on clearly erroneous findings of fact, improperly applies the law, or employs an erroneous legal standard, or when we are firmly convinced that the trial court committed a clear error of judgment."

*Martin v. United States*, 889 F.3d 827, 831 (6th Cir. 2018) (quoting *United States v. Kilpatrick*, 798 F.3d 365, 378 (6th Cir. 2015)).

Under 28 U.S.C. § 2255, "[a] prisoner in custody" for a federal crime and "claiming the right to be released . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). The statute states the grounds on which a petitioner may make such a motion: if the sentence violated federal law, the court lacked jurisdiction to impose the sentence, the sentence exceeded the statutory maximum, or the sentence "is otherwise subject to collateral attack . . . ." *Id.* Said differently, a § 2255 motion "must allege . . . : (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001). "Ineffective assistance of counsel claims are cognizable" within the first of those categories. *Gilbert*, 64 F.4th at 770 (citing *Massaro v. United States*, 538 U.S. 500, 504, 508–09 (2003)); *United States v. Doyle*, 631 F.3d 815, 817 (6th Cir. 2011).

Section 2255 requires the court to grant a hearing to a petitioner "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief . . . ." 28 U.S.C. § 2255(b). The deciding court "must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). Conversely, "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.* The record might preclude habeas relief "if the petitioner's allegations '. . . are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.'" *Arredondo*, 178 F.3d at 782 (quoting *Engelen v. United States*,

68 F.3d 238, 240 (8th Cir. 1995)). If, however, the petitioner offers an affidavit describing a plausible factual narrative and "the government offers nothing more than contrary representations to contradict it, the defendant is entitled to an evidentiary hearing." *Villa v. United States*, 56 F.4th 417, 420 (6th Cir. 2023) (quoting *Huff v. United States*, 734 F.3d 600, 607 (6th Cir. 2013)).

We should remand for an evidentiary hearing unless the record contradicts Beemath's ineffective assistance claim, the claim is inherently incredible, or the claim comprises conclusions rather than factual allegations. "[T]he first step[,]" then, "is to determine whether [Beemath]'s factual allegations, accepted as true, show that" he received ineffective assistance of counsel. *Ata v. Scutt*, 662 F.3d 736, 743 (6th Cir. 2011). "The second step . . . requires a review of the record to ensure it does not refute" Beemath's position. *Id.* at 744.

Beemath's claim is that he received incomplete legal advice. He says that his attorneys did not advise him that he could raise a good faith defense. And he insists that he would have proceeded to trial rather than plead guilty if he had known he could raise his "objectively reasonable belief that his prescribing practices were within the wide bounds of acceptable medical purposes." Pet'r's Br. 14. Under the Sixth Amendment, a criminal defendant has a constitutional right to "the effective assistance of counsel at 'critical stages of a criminal proceeding,' including when he enters a guilty plea." *Lee v. United States*, 582 U.S. 357, 363 (2017) (quoting *Lafler v. Cooper*, 566 U.S. 156, 165 (2012)). To make out an ineffective assistance of counsel claim, the petitioner must meet the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984): showing that (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." 466 U.S. at 687. To establish entitlement to a hearing, Beemath would have to show that he has presented facts that would support his position with respect to each of those two prongs and that the record does not refute those facts.

On the performance prong, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness . . . considering all the circumstances." *Id.* at 688. A court's assessment of counsel's performance "must be highly deferential[,]" *id.* at 689, and "linked to the practice and expectations of the legal community" in terms of "prevailing professional norms[,]" *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010) (quoting *Strickland*, 466 U.S. at 688). The Court must consider, then, whether Beemath's attorneys met objective standards of reasonableness in how they investigated and advised Beemath on the possibility of a good faith defense.

The defense seems plausible, at least in theory. Section 841 of title 21 of the U.S. Code states, "Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance . . . ." 21 U.S.C. § 841(a). Thus, knowing or intentional distribution or possession with intent to distribute controlled substances is unlawful *except as authorized*. In *Ruan v. United States*, 597 U.S. 450 (2022), the U.S. Supreme Court explained that a doctor's prescription of controlled substances is "authorized when a doctor issues it 'for a legitimate medical purpose . . . acting in the usual course of his professional practice.'" 597 U.S. at 454 (alteration in original) (quoting 21 C.F.R. § 1306.04(a) (2021)). Because such use is "authorized" under the statute, "[a]fter a defendant produces evidence that he . . . was authorized to dispense controlled substances, the Government must prove beyond a reasonable doubt that the defendant knew that he . . . was acting in an unauthorized manner, or intended to do so." *Id. Ruan* thus established a subjective standard, making way for a subjective good faith defense.

Before *Ruan*, and at the time of Beemath's conviction and sentencing, the Sixth Circuit used an objective, rather than subjective, standard for determining whether a physician's

prescriptions were authorized. *United States v. Anderson*, 67 F.4th 755, 764 (6th Cir. 2023) (per curiam); *see also United States v. Godofsky*, 943 F.3d 1011, 1026–27 (6th Cir. 2019) (explaining that, at the time of the decision, "good faith" meant objective good faith), *abrogated by Ruan*, 597 U.S. 450. The government did not have to prove that the defendant subjectively lacked good faith. *Anderson*, 67 F.4th at 764. Only after *Ruan*, which the Supreme Court decided after Beemath's sentencing and judgment, did that requirement come to be. *Id.* To the extent that Beemath argues that his counsel was ineffective for failing to encourage a subjective good faith defense, "counsel is not typically deficient for failing to anticipate a change in law . . . ." *Wallace v. United States*, 43 F.4th 595, 602 (6th Cir. 2022).

To the extent that Beemath wishes he had raised an *objective* good faith defense, that option seems to have been available. The record does not refute the allegations that Beemath asked counsel about a good faith defense and that counsel told him it did not exist. In fact, counsel's affidavit stating that both attorneys provided reasonable legal services does not address that argument at all. The conversations in which Beemath and his lawyers discussed the potential defense would, reasonably, be off the record. So, theoretically, a hearing might help decide whether such a conversation occurred. *See Martin*, 889 F.3d at 835 (finding a factual dispute requiring an evidentiary hearing where the parties "present[ed] very different accounts[,]" and the record supported both arguments); *Villa*, 56 F.4th at 420 (finding that conflicting affidavits by the parties created a dispute requiring an evidentiary hearing); *Valentine v. United States*, 488 F.3d 325, 334 (6th Cir. 2007) (finding that defendant "present[ed] a factual narrative of the events that is neither contradicted by the record nor 'inherently incredible'" and that an evidentiary hearing was required to "assess its veracity").

However, the notion that an objective good faith defense would have been advisable, based on the record, strains credulity. *Cf. Godofsky*, 943 F.3d at 1029 (finding that petitioner was not entitled to relief for ineffective assistance of counsel because the record "[did] not support an *objective*-good-faith instruction"). Preceding the conduct for which Beemath was convicted, he had previously been disciplined for unethical prescribing of controlled substances and required to undergo training. Evidence offered by the government shows that Beemath prescribed dangerous drugs to patients even when they failed their urine screenings. And he coached patients on how to pass those urine tests. The government's expert, having reviewed Beemath's patient records, opined that Beemath's practices were beyond good faith. And Beemath admitted in his plea hearing that he "ha[d] an agreement with [others] to prescribe controlled substance [sic] for illegitimate medical purposes" and knowingly recruited patients without any legitimate medical need and prescribed them controlled substances.[1] Plea Hr'g Tr., R. 134, PageID #858.

In this case, a good faith defense would seem frivolous. Although the decision of whether to present a defense is within the province of the defendant, *Robert Leroy McCoy v. Louisiana*, 584 U.S. 414, 422 (2018), if counsel investigates each "plausible line of defense, . . . the strategic choices made as a result 'will seldom if ever' be found wanting[,]" *Strickland*, 466 U.S. at 681 (quoting *Washington v. Strickland*, 693 F.2d 1243, 1254 (5th Cir. 1982), *rev'd*, 466 U.S. 668 (1984)). If counsel did advise Beemath that the good faith defense was unavailable to him, that advice would appear to be sound. We do not see how an evidentiary hearing would alter that conclusion.

---

[1] Although such admissions at a plea hearing would not undermine a good-faith defense or show that proceeding to trial would have been ill-advised in every instance, the record corroborates Beemath's detailed admissions, and Beemath offers nothing from the record to raise doubt about their sincerity or weight.

Any alleged deficiency did not prejudice Beemath, in any event. Prejudice means "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

When a petitioner claims that ineffective counsel led him to plead guilty instead of going to trial, "we do not ask whether, had he gone to trial, the result of that trial 'would have been different' than the result of the plea bargain." *Lee*, 582 U.S. at 364. Rather, we ask "whether the defendant was prejudiced by the 'denial of the entire judicial proceeding . . . to which he had a right.'" *Id.* (alteration in original) (quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 483 (2000)). The question is whether the petitioner has shown "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Missouri v. Frye*, 566 U.S. 134, 148 (2012) (quoting *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)); *see also Carson v. United States*, 88 F.4th 633, 639 (6th Cir. 2023) ("To prove prejudice in this situation, defendants must show that they would have stood trial if their lawyers had not committed the mistakes that made their representation deficient."). Beemath both "must convince the court that a decision to reject the plea bargain would have been rational under the circumstances[,]" *Padilla*, 559 U.S. at 372, and "show[] it's reasonably likely *he* would have taken that route." *United States v. Singh*, 95 F.4th 1028, 1033 (6th Cir.) (citing *Lee*, 582 U.S. at 369), *cert. denied*, 145 S. Ct. 167 (2024). Where the petitioner's "decision about going to trial turn[ed] on his prospects of success and those [were] affected by the attorney's error[,]" the petitioner "must also show that he would have been better off going to trial." *Lee*, 582 U.S. at 365.

For Beemath to show that there was a reasonable probability that it would have been rational for him to go to trial if he had known he could raise a good faith defense, he must show that such a defense would have been effective. For the same reasons that counseling against the good faith defense would have been reasonable legal advice, going to trial with that defense would not have been rational for Beemath. The government marshaled recordings of undercover conversations between Beemath and patients, clinic and state records, expert analysis, and witness statements, all suggesting that Beemath knew that he was acting outside of professional practice and for no legitimate purpose. The evidence in the record overwhelmingly negates Beemath's assertion that he could have effectively defended himself based on objective good faith.

Furthermore, Beemath fails to convince us that he personally would have made the choice to go to trial. "Only in 'unusual circumstances' will a defendant who conceded guilt at the plea stage be able to meet this 'high bar.'" *Singh*, 95 F.4th at 1033–34 (quoting *Lee*, 582 U.S. at 368–69). We avoid accepting "*post hoc* assertions" about how a petitioner would have acted in a counterfactual scenario without "contemporaneous evidence to substantiate" them. *Byrd v. Skipper*, 940 F.3d 248, 258–59 (6th Cir. 2019) (quoting *Lee*, 582 U.S. at 369).

Beemath claims that he asked counsel about a good faith defense before pleading guilty. If true, that fact would be favorable to Beemath as contemporaneous evidence that he might have chosen to go to trial with that defense. *See id.* at 259 (finding support in the defendant's contemporaneous question to counsel about a plea); *Lee*, 582 U.S. at 362, 369 (noting that petitioner and counsel testified that the issue on which counsel misadvised petitioner had been determinative in decision to accept plea, that government did not dispute testimony, and that petitioner had seemed confused about the issue at the plea hearing). Additionally, Beemath seems to have diligently investigated his case, including reviewing evidence while incarcerated, and

expressed disinterest in a guilty plea until a week before trial. In fact, the district court and the government recognized that Beemath's guilty plea basically arrived after all of the trial preparation was complete. The parties had exchanged discovery, prepared experts, filed motions *in limine*, and even filed their joint proposed voir dire.

But, importantly, this is a case where Beemath's "decision about going to trial turn[ed] on his prospects of success" alone. *Lee*, 582 U.S. at 365. Beemath does not identify any contemporaneous evidence showing that his decisionmaking process turned on anything other than his likelihood of conviction after trial. We thus have no trouble concluding that even if he had been advised of the objective good faith defense, it is not reasonably likely that he would have decided to pursue it.

### III.    CONCLUSION

The record forecloses Beemath's allegations that counsel gave him deficient legal advice regarding a good faith defense and that such advice prejudiced Beemath. The district court did not abuse its discretion by denying Beemath's § 2255 motion without a hearing. Therefore, we **AFFIRM** the district court's judgment.